**Kurt P. KROLL, Plaintiff–Appellant,**

v.

**DOCTOR'S ASSOCIATES, INC., Jeffrey Wilhelm, Frederick DeLuca and Peter H. Buck, Defendants–Appellees.**

No. 92–3621.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1993.

Decided Sept. 3, 1993.

David M. Duree (argued), Reinert, Duree & Crane, St. Louis, MO, David L. Mandell, Mandell & Ginsberg, Madison, WI, for plaintiff-appellant.

William M. Conley, Roberta F. Howell, Foley & Lardner, Madison, WI, Edward W. Dunham, Isabel E. Chenoweth, Wiggin & Dana, New Haven, CT, for defendants-appellees.

Before CUDAHY, MANION and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Doctor's Associates, Inc. (DAI), co-owned by Peter H. Buck and Frederick DeLuca, is the national franchisor of "Subway" sandwich shops. Appellee Jeffrey Wilhelm is a "development agent" for DAI. In May 1988, Kurt P. Kroll entered into two franchise agreements with DAI, each authorizing Kroll to operate a Subway restaurant in Wisconsin. Under the agreements, Kroll was required to "[b]egin operation of a sandwich shop within 365 days ... at a location found by [Kroll] and approved by [DAI]." ¶ 5(a).[1] Kroll did not fulfill this obligation, and, as a result, DAI became entitled to terminate the franchise agreements. ¶ 8(b)(1) (DAI may terminate agreement if Kroll fails to "substantially perform all of the terms and conditions" thereof).

DAI did not immediately notify Kroll that it intended to terminate the franchise agreements. Instead, Janet Flewwellin, an employee in DAI's legal department, contacted Kroll by letter dated July 20, 1989. She informed him that, in an attempt to update its own files, DAI was contacting all of its franchisees who had purchased franchises more than a year earlier but who had yet to open a store. The letter stated that DAI, apparently on its own initiative, was granting Kroll a 180–day "extension" to begin operating his two Subway franchises, but that it was "electing to terminate" the franchises unless Kroll opened his stores during that period.

A year later, Kroll still had not opened either Subway shop. Despite the language in the July 1989 letter to the effect that Kroll's franchises would "terminate without any further notice" if he failed to begin operations during the 180–day extension, Flewwellin sent Kroll another letter, dated July

---

**1.** This same paragraph also provides that Kroll was entitled to request additional time to begin operations.

18, 1990, identical in all material respects to the one she had sent him the previous July. Specifically, DAI, again sua sponte, granted Kroll another 180–day period to construct and open his shops. DAI also reiterated that Kroll's franchises would terminate without additional notice if the franchises were not opened within the extension period. Still another year later, in July and August 1991, Kroll finally found two sites that he thought were ideal for Subway shops. Kroll contacted Flewwellin and Wilhelm to see if he could still use the franchises that he had initially purchased in May 1988. Kroll alleges that they responded affirmatively and that, in reliance on such representations, he disclosed to them important details concerning the sites upon which he intended to build his Subway shops. Kroll alleges that Wilhelm then contacted the individuals who owned these sites, or, at least, were responsible for leasing them, and arranged for franchisees other than Kroll to use them as sites for Subway shops. Flewwellin sent Kroll a letter dated September 12, 1991, informing him that his request for reinstatement of the two franchises was denied.

Kroll filed suit in Wisconsin state court alleging that Flewwellin and Wilhelm had fraudulently misrepresented that they, and through them DAI and the other appellees, intended to reinstate Kroll's two dormant expired franchises.[2] The appellees removed the case to the district court; jurisdiction was predicated upon a diversity of citizenship. DAI moved the district court, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16, to dismiss or stay the lawsuit pending arbitration.[3] The district court granted the motion and Kroll appeals.[4] We now affirm with modification.

■ The duty to arbitrate is one assumed by contract, *A.T. & T. Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), and contracts have temporal as well as substantive limitations. Kroll does not deny that the arbitration clause in the franchise agreements encompasses his claims and that, if it still applies, we must affirm the district court. Instead, he contends that the arbitration clause is immaterial because the franchise agreements expired some months before the fraud of which he complains occurred. We have indeed held that the dead hand of a long-expired arbitration clause cannot govern forever. *See, e.g., Local 703, International Brotherhood of Teamsters v. Kennicott Brothers Co.*, 771 F.2d 300 (7th Cir.1985). But we do not believe that the arbitration clause at issue here is in fact deceased, even though the parties have been willing to sign its death certificate.

We begin by assuming that the franchise agreements expired on or about January 18, 1991, 180 days after Flewwellin's letter to Kroll dated July 18, 1990. Six months later, however, the parties resuscitated the franchise agreements and with them the arbitration clause. According to Kroll's complaint, the following events occurred during July and August 1991:

1. After identifying locations suitable for Subway restaurants, Kroll contracted Flewwellin and asked if he could use the franchises he purchased in May 1988 to operate shops at these sites. Flewwellin responded that DAI had no objection to such use as long as Wilhelm did not object. Complaint ¶¶ 37–38.

2. Kroll then contacted Wilhelm and posed the same question. Complaint ¶ 39.

3. Wilhelm responded that he did not object to Kroll's use of the May 1988 franchises as long as DAI's "home office" approved. Complaint ¶ 40.

When Wilhelm agreed that Kroll could use the May 1988 franchises, there was, based on the complaint, an apparent "meeting of the minds" on that point between all of the necessary contracting parties. Kroll desired re-

---

2. Kroll alleges that DAI is the "alter ego" of DeLuca and Buck.

3. The franchise agreements contain a clause that commits to arbitration "[a]ny controversy or claim arising out of or relating to [the agreement] or the breach thereof." ¶ 10(c).

4. The district court dismissed Kroll's complaint without prejudice, subject to reinstatement after Kroll pursues arbitration as required by the franchise agreements.

instatement and proceeded on the assumption that he had achieved it. Flewwellin and Wilhelm, on behalf of DAI, again according to the complaint, acceded to reinstatement. Thus, even if the franchise agreements did expire in February 1991, Kroll did what he believed was needed to bring them—and their arbitration clauses—back to life in August. With contracts, there can be life after death.

The conduct of which Kroll complains took place after the agreements had apparently been reactivated. *See* Complaint ¶ 42 ("In reliance upon these representations [that Kroll could use the May 1988 franchise agreements] [Kroll] then disclosed the details of [the sites upon which he hoped to build Subway shops]"); Complaint ¶ 44 ("As soon as [Kroll] disclosed the locations of these two prospective sites ... [DAI sought to obtain these] locations for franchisees ... other than [Kroll]") & Complaint ¶ 47 ("Immediately after [Kroll] provided ... Wilhelm with the information about the new site locations ... [DAI] immediately refused to permit plaintiff to use his two ... franchise agreements."). These claims undeniably "arise out of or relate to" the putatively revived franchise agreements themselves and, as a result, are within the reach of their arbitration provisions.[5]

■ Kroll contends that DAI's actions constitute fraud, and they may, although they also seem to us to be along the lines of a breach of contract.[6] Kroll, of course, is entitled to plead his case in any manner he chooses. But a plaintiff may not avoid an otherwise valid arbitration provision "merely by 'casting its complaint in tort.'" *Sweet Dreams Unlimited, Inc. v. Dial–A–Mattress International, Ltd.,* 1 F.2d 639, 643 (7th Cir. 1993) (quoting *In re Oil Spill by the "Amoco Cadiz" etc.,* 659 F.2d 789, 794 (7th Cir.1981)). The touchstone of arbitrability in such situations is the relationship of the tort alleged to the subject matter of the arbitration clause. *Id.* As we previously observed, the fraud claims asserted here are arbitrable because they are directly related to the agreements themselves.

Kroll contends that, even if the arbitration provision is applicable, it lacks mutuality and thus is unenforceable. Kroll points out that Subway franchisees are required to lease the sites for their restaurants from certain real estate leasing companies, owned by DeLuca and Buck,[7] and that the relevant leases permit the leasing companies to bring eviction actions against the franchisee in cases of breach while the franchisee must arbitrate all disputes with DAI. This argument is entirely hypothetical, however, because, as Kroll readily admits, he has yet to sign a lease with any of these leasing companies.

The arbitration provision in the franchise agreements is unquestionably mutual on its face, i.e., both Kroll and DAI must arbitrate all disputes arising out of or relating to the franchise agreements. We assume, without deciding, that this mutuality could be destroyed if, as Kroll has alleged, DAI were able to avoid its duty to arbitrate by using a group of interlocked, shell corporations. But, even if we also assume (1) that the leasing companies are DAI's "alter egos," (2) that Kroll required to sign a lease with one or more of them prior to opening his Subway franchises and (3) that these companies may seek judicial remedies against Kroll in the event of his breach, we still cannot conclude that the arbitration provision in the franchise agreements is unenforceable.

---

5. We do not hold that the contracts were reinstated for all purposes, but merely that Kroll, according to his own pleading, proceeded on the assumption that they had been reinstated with the approval of the other party. It is hard to see how the contracts could have been re-invoked without their carrying the arbitration clause back into the dealings of the parties. In *Kennicott,* 771 F.2d 300, on which Kroll relies in part, the labor contract at issue expired, negotiations to replace it broke off and there was no suggestion of an extension of the old agreement or of its replacement by a new one.

6. Kroll's counsel eschewed our suggestions at oral argument that his client might have more success on a breach of contract theory. Counsel did not assert, however, that there was no contract to be breached. We are not, in any event, bound by Kroll's legal characterization of the facts. *Cf. Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1033 (7th Cir.1987).

7. Kroll contends that these leasing companies are DAI's "alter egos" and cites several cases in which courts have agreed with this characterization.

To begin with, parties can agree to arbitrate some disputes and not others. *See, e.g., International Brotherhood of Teamsters, Local Union No. 371 v. Logistics Support Group*, 999 F.2d 227 (7th Cir.1993). Thus, the fact that Kroll and DAI have agreed to arbitrate all disputes pertaining to the franchise agreements but may decide to litigate any alleged breach of the real estate leases would not undermine the mutuality of the franchise agreements' arbitration provision. Kroll hints at the more troubling situation in which the lease defines "breach" to include any violation of the franchise agreement, thus permitting the leasing company, which, according to Kroll's allegations is nothing more than a front for DAI, to litigate under the guise of breaches of lease what are really disputes pertaining to the franchise agreements. But Kroll never signed such a lease. Nor is there any evidence in the record that he would have been required to do so.[8] As this case stands, therefore, Kroll and DAI are mutually obligated to arbitrate all disputes, such as the one presented here, arising out of or relating to the franchise agreements. Kroll's argument to the contrary is far too speculative for us to credit.[9]

Kroll also argues that his lawsuit should, at the very least, be allowed to proceed against the individual defendants since he "did not agree to arbitrate anything with ... [Wilhelm], [DeLuca] and [Buck]." Kroll's Br. at 19. We have previously observed, however, that section three of the Federal Arbitration Act "plainly requires that a district court stay litigation where *issues* presented in the litigation are the subject of an arbitration agreement." *Mor-*

*rie & Shirlee Mages Foundation v. Thrifty Corp.*, 916 F.2d 402, 407 (7th Cir.1990) (hereinafter *Mages* ). We went on to hold that a stay must be granted, even in favor of persons that are not party to the agreement containing the arbitration clause, if the litigation is an attempt "to evade the agreed-upon resolution of their disputes in the arbitration forum by introducing the identical controversy against a party who is ultimately liable for the arbitrating party's acts." *Id.*

DeLuca's and Buck's liability, if any, is derivative. They may be potentially liable for any money demands against DAI since they own DAI's stock. We note, however, that the present record is barren of any reason why DAI's corporate veil should be pierced, thereby making DeLuca and Buck liable for DAI's debts in derogation of the corporate law rule of limited liability for shareholders.[10] We are left to conclude that Kroll's suit against DeLuca and Buck has no plausible purpose other than to evade its duty to arbitrate its disputes with DAI. Accordingly, a stay must issue in favor of DeLuca and Buck.

Wilhelm's potential liability, on the other hand, is direct—Kroll alleges that he perpetrated a fraud. Nevertheless, we conclude that a stay of the litigation against him is also in order. Our decision in *Mages* was motivated by the clear language of the Federal Arbitration Act that a stay issue in any suit involving an "issue referable to litigation" as well as by our concern that litigation against a party not bound by an arbitration provision may impair an arbitrator's consideration of claims against a party that is compelled to arbitrate. 916 F.2d at 407 & 9

---

8. There is evidence that indicates that Kroll would have had to sign leases with one of the leasing companies owned by DeLuca and Buck in order to operate his Subway franchises. But what the terms of these leases would have been is pure speculation. In fact, it is not wholly unreasonable to assume that the leasing companies might have changed their leases, particularly considering the poor reception that the present leases have received in other jurisdictions, to ensure the mutuality of the franchise agreements' arbitration provision. At the very least, this assumption is no more speculative than the belief that the leasing companies would require Kroll to sign a lease that effectively eliminates DAI's duty to arbitrate while retaining Kroll's.

9. Kroll's argument that the district court erred by refusing to submit the question of mutuality to a jury is, as a result, also rejected. Kroll's lack of mutuality defense hinges on the interrelationship of the franchise agreements and the leases that Kroll contends he would have had to sign. Whether or not these documents, considered together, compelled arbitration of Kroll's claims may have been triable to a jury pursuant to 9 U.S.C. § 4 as Kroll suggests. But because the leases do not now exist, there would be nothing for a jury to decide.

10. Even if the leasing companies were the alter egos of DAI it does not follow automatically that DAI's own corporate existence must be ignored.

U.S.C. § 3. Since DAI's liability, if any, derives from the conduct of Wilhelm, and others, a suit against him may have collateral estoppel effect in the Kroll–DAI arbitration, thus impairing the arbitrator's ability to consider Kroll's claims against DAI. Moreover, Wilhelm's conduct will also be an issue in both the proceedings against him and in the Kroll–DAI arbitration. Thus, the Federal Arbitration Act and our decision in *Mages* require a stay of the proceedings against Wilhelm.

Finally, despite the district court's acknowledgment that a court must stay litigation in the face of valid arbitration provision, it went on to dismiss Kroll's complaint without prejudice. The district court has cited no authority for this action and we have been unable to find any on our own. Moreover, the relevant portion of the Federal Arbitration Act, pursuant to which the district court acted, authorizes only a stay of litigation pending completion of the arbitration proceedings. Although we agree with the district court that this litigation may not proceed until the arbitrator has finished her work, we conclude that the proper disposition is a stay rather than a dismissal. With this modification, we AFFIRM the judgment of the district court.